FEDERAL TRADE COMMISSION,
Appellee,

v.

KEN ROBERTS COMPANY,
et al., Appellants.

No. 00–5266.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 4, 2001.

Decided Dec. 28, 2001.

Rehearing and Rehearing En Banc
Denied March 1, 2002.

Neil A. Goteiner argued the cause for appellants. With him on the briefs was Richard E. Nathan.

Lawrence DeMille-Wagman, Attorney, Federal Trade Commission, argued the cause for appellee. With him on the brief was John F. Daly, Assistant General Counsel.

John G. Gaine was on the brief for amicus curiae Managed Funds Association.

Before: EDWARDS, ROGERS, and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

The appellants – Ken Roberts Company ("KRC"), Ken Roberts Institute, Inc. ("KRI"), United States Chart Company ("Chart"), and Ted Warren Corporation ("Warren") (collectively "Ken Roberts") – sell instructional materials that purport to teach would-be investors how to make money investing in the commodities and

securities markets. In an effort to determine whether Ken Roberts had engaged in deceptive advertising or selling of goods or services in violation of sections 5 and 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45, 52, the Federal Trade Commission ("FTC") issued civil investigative demands ("CIDs") requiring Ken Roberts to produce documents and to respond to interrogatories relating to the companies' business practices. The appellants answered some of the interrogatories, but declined to respond to most of what had been requested. Ken Roberts then filed a Petition to Quash with the FTC. The appellants claimed that, because the regulation of their advertising practices was subject to the exclusive jurisdiction of the Commodities Futures Trading Commission ("CFTC") or the Securities and Exchange Commission ("SEC"), the FTC lacked authority to investigate. The FTC denied the petition and then filed its own petition in District Court seeking an order to enforce the CIDs. On May 26, 2000, the District Court granted the FTC's petition and ordered Ken Roberts to comply with the CIDs. The appellants now seek review of that judgment.

Ken Roberts contends that, pursuant to the express terms of the Commodity Exchange Act ("CEA"), the CFTC has exclusive jurisdiction to regulate the disputed business practices of Ken Roberts Company and United States Chart Company. Ken Roberts claims further that, because Ken Roberts Institute and Ted Warren Corporation are subject to pervasive regulation by the SEC under the Investment Advisors Act ("IAA"), the FTC's authority to investigate these companies has been impliedly preempted. Therefore, according to Ken Roberts, because the FTC is without authority to regulate the cited advertising and promotional practices of Ken Roberts, the CIDs cannot be sustained. We disagree.

With rare exceptions (none of which applies here), a subpoena enforcement action is not the proper forum in which to litigate disagreements over an agency's authority to pursue an investigation. Unless it is patently clear that an agency lacks the jurisdiction that it seeks to assert, an investigative subpoena will be enforced. Whatever the ultimate merit of Ken Roberts' preemption arguments – and we believe they have little – appellants cannot overcome the long-standing doctrine that precludes courts from entertaining challenges to the jurisdiction of administrative agencies during subpoena enforcement proceedings. Because under no reasonable reading of the CEA or the IAA does either of those statutes manifestly strip the FTC of its broad power over deceptive advertising, we affirm the District Court's decision that appellants must comply with the FTC's compulsory process.

## I. BACKGROUND

KRC and Chart market courses in commodities trading and are therefore subject to the jurisdiction of the CFTC. KRI and Warren offer instruction in securities trading, which places them within the regulatory ambit of the SEC. These companies rely heavily on Internet advertising: their websites feature grandiose claims about potential earnings by investors and testimonials from persons who have allegedly benefitted from Ken Roberts' instructional materials.

Since 1994, the CFTC has carefully monitored the activities of KRC to determine whether the company had violated various sections of the CEA, particularly the statute's antifraud provisions, 7 U.S.C. § 6o (1999). In at least four separate investigations, the Commission sought to determine whether KRC's advertising claims, both in print and, more recently, on-line, can be substantiated. To this end,

the CFTC repeatedly used its subpoena power to· compel KRC to turn over business records and detailed documentation supporting the promotional claims that it has made. The company always has responded to CFTC subpoenas, and never has been sanctioned or forced to admit any wrongdoing. While one investigation did lead to a consent decree, pursuant to which KRC and Chart registered with the CFTC as commodity trading advisers ("CTAs"), *see* 7 U.S.C. § 1a(5), the Commission has never taken enforcement action against KRC.

In 1999, the FTC, in conjunction with the CFTC and the SEC, announced a coordinated investigation of deceptive day trading promotions. In early September 1999, the FTC formally authorized the use of compulsory process to determine whether various on-line merchants were engaged in deceptive marketing practices. With an investigative agenda aimed at high-risk/high-yield investment activity and suspicious Internet advertising, the Commission soon focused on Ken Roberts. On September 30, 1999, the FTC issued CIDs requesting a wide variety of information through written interrogatories and documents relating to Ken Roberts' business practices. The CIDs were designed to reveal whether the companies had mislead the public in promoting their instructional courses. To this end, the Commission demanded a full accounting of the companies' sales volume, as well as evidence underlying the claims made in their testimonials and other advertising materials.

Appellants resisted complying fully with the CIDs, believing them to be duplicative of the subpoenas that .had already been issued by the CFTC and beyond the FTC's power to issue. Thus, Ken Roberts responded only to some of the interrogatories and produced none of the requested documents. They then filed an administrative petition with the FTC to quash the

CIDs. In that proceeding, Ken Roberts argued, as they do here, that the CEA and the IAA deprive the Commission of its jurisdiction to regulate – and therefore to investigate – deceptive advertising practices of, respectively, CTAs and investment advisers. The FTC rejected this petition, holding that the subpoenas were issued as part of a lawful investigation, one fully authorized by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 41 *et seq.* (1997), and not foreclosed by any rival regulatory statute. *See* In re Petition of The Ken Roberts Co. et al. to Quash Civil Investigative Demands, File No. 9923259 (Feb. 25, 2000), *reprinted in* Joint Appendix ("J.A.") 72. When Ken Roberts persisted in refusing to comply with the CIDs, the FTC petitioned the District Court to compel enforcement pursuant to 15 U.S.C. § 57b-1(e). In a brief order, the District Court granted the agency's petition to enforce. *See FTC v. Ken Roberts Co.,* Order, Misc. No. 00-204 (May 26, 2000), *reprinted in* J.A. 248. Ken Roberts now appeals.

## II. DISCUSSION

Appellants ask this court to hold that the jurisdiction-conferring provisions of the CEA and the IAA preempt – the former expressly, the latter implicitly – the jurisdiction that the FTC would otherwise possess over appellants' allegedly deceptive marketing of their investor-training courses. Though the nature of our analysis obliges us to investigate these questions, we need not answer them definitively, for we have concluded that Ken Roberts' challenge is premature.

### A. Jurisdictional Challenges to Agency Subpoenas

■ The threshold issue in this case is whether the appellants may raise their challenge to the Commission's jurisdiction now, or instead whether they are obliged

to await an actual enforcement action. In upholding the judgment of the District Court, we are governed by the long-standing doctrine that administrative agencies must be given wide latitude in asserting their power to investigate by subpoena. As the Second Circuit has noted:

[A]t the subpoena enforcement stage, courts need not determine whether the subpoenaed party is within the agency's jurisdiction or covered by the statute it administers; rather the coverage determination should wait until an enforcement action is brought against the subpoenaed party.

*United States v. Construction Prods. Research, Inc.,* 73 F.3d 464, 470 (2d Cir.1996).

The Supreme Court first articulated this doctrine in *Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943). *Endicott* established that, as a general proposition, agencies should remain free to determine, in the first instance, the scope of their own jurisdiction when issuing investigative subpoenas. The Court therefore held that the Secretary of Labor was entitled to enforce a subpoena for payroll records issued in an effort to determine whether Endicott Johnson had run afoul of the Walsh-Healey Public Contracts Act. The District Court had scheduled a trial to determine whether Endicott was covered by the Act, but the Supreme Court rejected this approach. Rather, the Court held that, because "[t]he evidence sought by the subpoena was not *plainly incompetent or irrelevant to any lawful purpose* of the Secretary in the discharge of her duties under the Act ... it was the duty of the District Court to order its production for the Secretary's consideration." *Id.* at 509, 63 S.Ct. at 343 (emphasis added).

Following *Endicott,* courts of appeals have consistently deferred to agency determinations of their own investigative authority, and have generally refused to entertain challenges to agency authority in proceedings to enforce compulsory process. *See, e.g., United States v. Sturm, Ruger & Co.,* 84 F.3d 1, 5 (1st Cir.1996) ("We have repeatedly admonished that questions concerning the scope of an agency's substantive authority to regulate are not to be resolved in subpoena enforcement proceedings."); *Construction Prods. Research,* 73 F.3d at 468-73 (enforcing subpoena issued by Nuclear Regulatory Commission over objection that the subject matter of the agency's investigation was reserved by law for the Department of Labor); *EEOC v. Peat, Marwick, Mitchell & Co.,* 775 F.2d 928, 930 (8th Cir.1985) ("The initial determination of the coverage question is left to the administrative agency seeking enforcement of the subpoena."); *Donovan v. Shaw,* 668 F.2d 985, 989 (8th Cir.1982) ("It is well-settled that a subpoena enforcement proceeding is not the proper forum in which to litigate the question of coverage under a particular federal statute."); *FTC v. Ernstthal,* 607 F.2d 488, 490 (D.C.Cir.1979) (acknowledging a concession that "an individual may not normally resist an administrative subpoena on the ground that the agency lacks regulatory jurisdiction if the subpoena is issued at the investigational stage of the proceeding").

Subpoena enforcement power is not limitless, however. In *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950), the Court emphasized that a subpoena is proper only where "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." Accordingly, "there is no doubt that a court asked to enforce a subpoena will refuse to do so if the subpoena exceeds an express statutory limitation on the agency's investigative powers." *Gen. Fin. Corp. v. FTC,* 700 F.2d 366, 369 (7th Cir.1983). Thus, a court must "assure itself that the subject matter of the investi-

gation is within the statutory jurisdiction of the subpoena-issuing agency." *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 386 (D.C.Cir.1981); *see also FTC v. Texaco, Inc.*, 555 F.2d 862, 879 (D.C.Cir.1977) (en banc) (administrative subpoenas should be enforced unless the information sought is irrelevant to "a lawful purpose of the agency"). These cases amply demonstrate that while the courts' role in subpoena enforcement may be a "strictly limited" one, it is neither minor nor ministerial. *See FTC v. Anderson*, 631 F.2d 741, 744 (D.C.Cir. 1979).

In adhering to the foregoing principles, we have held that enforcement of an agency's investigatory subpoena will be denied only when there is "a patent lack of jurisdiction" in an agency to regulate or to investigate. *See CAB v. Deutsche Lufthansa Aktiengesellschaft*, 591 F.2d 951, 952 (D.C.Cir.1979); *see also Gov't of Territory of Guam v. Sea-Land Serv., Inc.*, 958 F.2d 1150, 1155 (D.C.Cir.1992); *Ernstthal*, 607 F.2d at 492 (declining to relax "the well-established barrier against ruling on the agency's regulatory jurisdiction in subpoena enforcement proceeding ... where the absence of jurisdiction is not patent, and there are no allegations of agency bad faith"). As the following discussion will demonstrate, there is no "patent lack of jurisdiction" in this case.

## B. Preemption of the FTC's Power to Regulate Deceptive Advertising

█ On its own terms, the FTC Act gives the FTC ample authority to investigate and, if deceptive practices are uncovered, to regulate appellants' advertising practices. *See* 15 U.S.C. §§ 45(a) (allowing the Commission to prevent unfair competition and deceptive acts or practices in or affecting commerce); 52-54 (allowing the Commission to regulate and enjoin false advertising); 57b-1(c) (allowing the Commission to issue CIDs to in-

vestigate possible § 45 violations). Therefore, the FTC is entitled to have its subpoenas enforced unless some other source of law patently undermines these broad powers. Appellants contend that two federal statutes have this effect. KRC and Chart, who sell courses in commodities investing, argue that the 1974 amendments to the Commodity Exchange Act expressly preempted the FTC's jurisdiction over their activities as registered CTAs. KRI and Warren, who sell courses in securities investing, argue that the Investment Advisers Act impliedly preempts the Commission's regulatory power over their advertisements. We consider these contentions in turn, and conclude that neither has merit.

### 1. Appellants' Claim of Express Preemption Pursuant to the Commodity Exchange Act

Though Congress has long sought to regulate the futures market, the Commodity Futures Trading Commission is not very old. The first federal statute dealing with commodities trading, the 1921 Future Trading Act, was declared unconstitutional by the Supreme Court, *see Hill v. Wallace*, 259 U.S. 44, 42 S.Ct. 453, 66 L.Ed. 822 (1922), and quickly replaced by the Grain Futures Act, which the Court upheld, *see Bd. of Trade of City of Chicago v. Olsen*, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1923). In 1936, this latter enactment was amended and renamed the Commodity Exchange Act. That initial version of the CEA delegated certain regulatory responsibilities to a commission composed of the Attorney General, along with the Secretaries of Agriculture and Commerce. *See Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 360-63, 102 S.Ct. 1825, 1830–32, 72 L.Ed.2d 182 (1982); S.Rep. No. 93-1131, at 13-14 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5855.

It was not until 1974, however, that the CFTC as it exists today was born. After considerable deliberation, Congress enacted the Commodity Future Trading Commission Act ("CFTCA"), an extensive overhaul of the CEA that both expanded the statute's coverage and dramatically altered its enforcement scheme. *Curran,* 456 U.S. at 365-66, 102 S.Ct. at 1832–33. Most importantly, the CFTCA for the first time brought *all* commodities under federal regulation; the earlier statutes had covered only enumerated agricultural goods that in no way represented the vast array of products that were actually being traded on futures markets. *See* H.R.REP. No. 93-963, at 38 (1974). The Commission spawned by the 1974 statute was an independent regulatory agency invested with broad powers to regulate futures trading and commodities exchanges. *See* S.REP. No. 93-1131, at 2-3, 1974 U.S.C.C.A.N. at 5844-45; *CFTC v. Schor,* 478 U.S. 833, 836, 106 S.Ct. 3245, 3249, 92 L.Ed.2d 675 (1986) (describing the "sweeping authority" entrusted to the CFTC). Congress authorized the CFTC to bring an action for injunctive relief in federal district court against anyone violating the CEA or the regulations promulgated thereunder. *See* Commodity Future Trading Commission Act of 1974, Pub.L. No. 93-463, § 211, 88 Stat. 1402 (1974) (codified as amended at 7 U.S.C. § 13a-1).

Moreover, and most important to the present case, the new agency was invested with exclusive jurisdiction over certain aspects of the futures trading market. *See id.,* § 201, 88 Stat. 1389 (codified as amended at 7 U.S.C. § 2(a)(1)(A) (2001)). The aim of this provision, according to one of its chief sponsors, was to "avoid unnecessary, overlapping and duplicative regulation," especially as between the Securities and Exchange Commission and the new CFTC. 120 Cong. Rec. H34,736 (Oct. 9, 1974) (remarks of House Agriculture Committee Chairman Poage); Philip F. John-

son, *The Commodity Futures Trading Commission Act: Preemption as Public Policy,* 29 VAND. L. REV. 12-13; 16-17 (1976).

In determining what Congress intended when it passed § 2(a)(1)(A), we must focus on the precise text of the enacted legislation. *See Carter v. United States,* 530 U.S. 255, 271, 120 S.Ct. 2159; 2170, 147 L.Ed.2d 203 (2000) ("In analyzing a statute, we begin by examining the text, not by psychoanalyzing those who enacted it.") (internal citations omitted). Section 2(a)(1)(A) reads as follows:

> The Commission shall have *exclusive jurisdiction* ... *with respect to accounts, agreements* (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), *and transactions involving contracts of sale of a commodity for future delivery,* traded or executed on a contract market designated or derivatives transaction execution facility registered pursuant to section 7 or 7a of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

7 U.S.C. § 2(a)(1)(A) (emphasis added). Appellants (KRC and Chart) contend that this provision precludes the FTC from regulating their activities as registered CTAs, because the statute gives the CFTC "exclusive jurisdiction" over "accounts, agreements ... and transactions involving contracts of sale of a commodity for future delivery." In other words, Ken Roberts claims that the advertising and promotion of educational materials that purport to teach investors how to get rich trading futures are "transactions involving contracts of sale of a commodity for future delivery." Thus, appellants would have us construe this phrase to confer exclusive jurisdiction on the CFTC over the marketing practices of firms that sell not commodities themselves, but rather instruction in commodities trading. We find this interpretation of the Commission's exclusive jurisdiction to be far-fetched, to say the least.

On its face, § 2(a)(1)(A) confers exclusive jurisdiction to the CFTC over a limited, discrete set of items related to the making of futures contracts. Specifically, these are (1) "accounts ... involving contracts of sale of a commodity for future delivery," (2) "agreements" involving the same, (3) "transactions" involving the same, and (4) "transactions subject to regulation by the Commission pursuant to section 23 of this title" (dealing with so-called "margin" or "leverage" contracts). It is certainly not obvious that the advertising at issue in this case fits in any of these categories. "Transactions," broadly construed, is perhaps appellants' best bet. Yet, it strains common parlance to construe "transactions involving contracts of sale of a commodity" to include the marketing practices of a firm that does not buy and sell futures, but rather merely instructs others how to do so. As it is generally understood, the word "transactions" conveys a reciprocity, a mutual exchange, which seems absent from the al-

legedly deceptive advertising materials that the FTC seeks to investigate in this case. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2425-26 (defining "transaction" as, *inter alia*, "a business deal" and "a communicative action or activity involving two or more parties or two things reciprocally affecting or influencing each other").

Appellants seek to overcome this impression by pointing to a separate provision in the statute that uses "transactions" in a different, and more expansive, way. As part of the 1974 overhaul of the CEA, Congress made a set of legislative findings in which it announced that the activities of CTAs, including "their advice, counsel, publications, writings, analyses, and reports[,] customarily relate to and their operations are directed toward and cause the purchase of commodities for future delivery...." 7 U.S.C. § 6*l*. This finding then goes on to say that "the foregoing *transactions* occur in such volume as to affect substantially *transactions* on contract markets." *Id.* (emphases added). Ken Roberts contends that because Congress used the term "transactions" to mean advice, counsel, publications, etc., in § 6*l*, we must read that term the same way in the exclusive jurisdiction provision in § 2(a)(1)(A). "The rule of *in pari materia* – like any canon of statutory construction – is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context." *Erlenbaugh v. United States,* 409 U.S. 239, 243, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972). In this case, however, appellants' attempted reliance on the *in pari materia* canon of construction is entirely unconvincing, because it proves far too much.

Appellants ignore the fact that § 6*l* uses the word "transactions" twice in the same

sentence to mean two different things. The second appearance of the word – "transactions on contract markets" – cannot reasonably embrace the broad set of activities contemplated by the first. Instead, the second reference to "transactions" in § 6*l* is best understood to refer to the actual trading of futures contracts. As such, the *in pari materia* rule is of little help to appellants, for it provides no guidance as to which construction of "transactions" the court should import from § 6*l* into § 2(a)(1)(A).

By contrast, when "transactions" is examined in the context of § 2(a)(1)(A), it seems most naturally read as encompassing, like its neighbors, a set of arrangements directly related to the actual sale of commodities futures. In statutory interpretation, after all, words are generally known by the company they keep. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575, 115 S.Ct. 1061, 1069, 131 L.Ed.2d 1 (1995) (describing and applying the *noscitur a sociis* canon). And here, because "accounts" and "agreements" seem so plainly to denote categories of financial arrangements through which the trading of commodities occurs or is facilitated, it makes sense to construe "transactions" in the same way.

These terms were added to the bill that became the CFTCA in order to extend the Commission's exclusive jurisdiction over so-called "discretionary accounts," commodity options, and other trading agreements described in the statute. *See* Johnson, at 14 & n.44; H.R. Conf. Rep. No. 93-1383 (1974), *reprinted in* 1974 U.S.C.C.A.N 5894, 5897 ("[T]he Commission's [exclusive] jurisdiction ... includes the regulation of commodity accounts, commodity trading agreements, and commodity options."). *Noscitur a sociis* instructs us to construe "transactions" in a similar light, as denoting a set of actions closely linked to the actual trading of com-

modities. Under this reading, all of the categories delineated in § 2(a)(1)(A) describe business deals that involve the buying and selling of futures, which comports with Congress' goal of conferring the CFTC with sole regulatory authority over "futures contract *markets* or other *exchanges,*" H.R. Conf. Rep. No. 93-1383, 1974 U.S.C.C.A.N. at 5897 (emphasis added), or "over options *trading* in commodities (but not in securities)," S.Rep. No. 93-1131, at 31, 1974 U.S.C.C.A.N. at 5870 (emphasis added).

A second problem with the broad definition of "transactions" proposed by the appellants is that it produces potentially absurd results. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). The first use of that word in § 6*l* sweeps more broadly than just the "advice," "counsel," and "publications" of CTAs; indeed, it includes their very "operations" as well. And an interpretation of § 2(a)(1)(A) under which the CFTC was given exclusive authority over all CTA "*operations* involving contracts of sale of a commodity," especially when coupled with the expansive reading of "involving" urged by appellants, would seem to preclude virtually any other government regulation affecting the futures trading industry. It could suggest, for example, that government agencies regulating employment relations or safety and health would be powerless to take action against CTAs. We do not believe that this is what Congress intended when it enacted § 2(a)(1)(A).

As noted above, the statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was "to be exclusive

with regard to the trading of futures *on organized contract markets.*" S.Rep. No. 93-1131, at 23, 1974 U.S.C.C.A.N. at 5863 (emphasis added). Indeed, as the Seventh Circuit has recognized, the goal of the CFTCA was to bring the futures markets "under a uniform set of regulations" and that "[o]nly in the context of market regulation does the need for uniform legal rules apply." *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago,* 977 F.2d 1147, 1155-57 (7th Cir.1992) (relying on this legislative purpose to hold that state common law actions against commodities brokers are preempted only when they would "directly affect trading on or the operation of a futures market"). It is true that the CFTC was created to regulate all commodities and commodities *trading, see Point Landing, Inc. v. Omni Capital Int'l Ltd.,* 795 F.2d 415, 420-21 (5th Cir.1986); it does not follow from this, however, that Congress intended to preempt the activities of all other federal agencies in their regulatory realms. "Preemption of the regulation of the market does not also mean preemption of all law that might involve participants in the market." *Poplar Grove Planting and Refining Co. v. Bache Halsey Stuart Inc.,* 465 F.Supp. 585, 592 (D.La.1979). Appellants' position makes no sense insofar as it suggests that the scope of the CFTC's exclusive jurisdiction is *broader* than the scope of the agency's authority to regulate under the CEA.

We will give appellants the benefit of the doubt and assume that what they really mean to argue is that the limits of the exclusive jurisdiction provision in § 2(a)(1)(A) is coterminous with the limits of the CFTC's regulatory authority under the CEA. In other words, Ken Roberts appears to assume that, at a minimum, whatever the Commission may regulate, it regulates exclusively. This is a specious contention. Both the text and purpose of the statute contemplate a regime in which other agencies may share power with the

CFTC over activities that lie outside the scope of § 2(a)(1)(A), but that still involve the activities of commodities advisers or that implicate other provisions of the CEA. Indeed, the inclusion of the so-called "regulatory savings clauses," § 2(a)(1)(A)(I)-(II), makes clear that other agencies, such as the FTC, retain their jurisdiction over all matters beyond the confines of "accounts, agreements, and transactions involving contracts of sale of a commodity for future delivery." *Cf. Chicago Mercantile Exch. v. SEC,* 883 F.2d 537, 550 (7th Cir.1989) (noting that § 2 "carries no implicit preemptive force").

The imperfect overlap between § 2(a)(1)(A) and the rest of the CEA is neatly demonstrated by the statute's anti-fraud provision, on which the CFTC's own power to investigate appellants, which it has done since 1994, presumably rests. 7 U.S.C. § 6*o* makes it unlawful, *inter alia,* for a CTA "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant." Thus, while the CFTC has the clear statutory authority to regulate a CTA's deceitful "practices" – and "practices," far more so than "transactions," comfortably describes the advertising at issue in this case – there is no reason to think that this authority is exclusive. A "practice" or "course of business" is quite plainly not a "transaction" – either in life or in this statutory provision. (Nor for that matter is it an "account" or "agreement.") As such, a comparison of the texts of § 6*o* and § 2(a)(1)(A) appears to indicate that the CFTC's authority over CTAs is broader than the substantive scope of its exclusive jurisdiction to regulate futures and futures markets.

In sum, then, both context (textual and historical) and common sense support a reading of the exclusive jurisdiction provi-

sion in which the phrase "accounts, agreements, and transactions involving contracts of sale of a commodity" does not cover the marketing of investor-education courses that leads only tangentially to the actual purchase of futures. While the FTC's investigation may implicate the CEA, we believe that it falls outside of the range of subjects described by § 2(a)(1)(A). At the very least, the foregoing discussion illustrates that there is no "patent lack of jurisdiction" in the FTC to investigate or regulate in this case. Appellants' preemption arguments are simply not compelling enough to overcome this court's longstanding chariness about entertaining jurisdictional challenges to administrative subpoenas. Accordingly, we hold that the District Court's properly allowed the FTC to proceed with its investigation of KRC and Chart.

### 2. Implied Preemption Under the Investment Advisers Act

KRI and Warren, whose businesses involve securities rather than commodities, assert that the comprehensive scope of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (1997), preempts the FTC's jurisdiction to regulate the fraudulent practices of "investment advisers" such as themselves. Even if there were something to this claim, which we doubt, it does not come close to establishing that the FTC is *manifestly* without jurisdiction in regard to the subject matter of its subpoenas.

In contrast to the CEA, the IAA contains no express exclusive jurisdiction provision. As such, the only vehicle by which the FTC's otherwise-plenary power to investigate and uproot unfair or deceptive trade practices could be disturbed is through the doctrine of implied repeal. We have recognized that, where intended by Congress, " 'a precisely drawn, detailed statute pre-empts more general remedies.' " *Galliano v. U.S. Postal Serv.*, 836

F.2d 1362, 1367 (D.C.Cir.1988) (quoting *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 834, 96 S.Ct. 1961, 1968, 48 L.Ed.2d 402 (1976)). This can occur either where the two enactments are in "irreconcilable conflict" or where the latter was clearly meant to serve as a substitute for the former. *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936); *cf. Demby v. Schweiker*, 671 F.2d 507, 513 (D.C.Cir.1981) (Wright, J., concurring) (describing the two kinds of implied repeals). Appellants contend that the antifraud provision of the IAA, which prohibit investment advisers from engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client," 15 U.S.C. § 80b-6(2), stands as just such a specific remedy that displaces the more general coverage of the FTC Act.

To prevail at this stage of the litigation, KRI and Warren must establish not merely that the IAA, properly construed, deprives the FTC of jurisdiction, but that it does so patently. However, the entire structure of the implied preemption inquiry militates against such a finding in this case. Both the Supreme Court and this court have observed that implied repeals of one statute (or a provision in one statute) by another are "not favored." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976) (quoting *United States v. United Cont'l Tuna Corp.*, 425 U.S. 164, 168, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976)); *Galliano*, 836 F.2d at 1369 ("strongly disfavored"). They are recognized only where the intention of the legislature is "clear and manifest." *Posadas*, 296 U.S. at 503, 56 S.Ct. at 351; *Morton v. Mancari*, 417 U.S. 535, 549-50, 94 S.Ct. 2474, 2482-83, 41 L.Ed.2d 290 (1974) (some "affirmative showing" of intent to repeal is necessary).

Because we live in "an age of overlapping and concurring regulatory jurisdiction," *Thompson Med. Co. v. FTC,* 791 F.2d 189, 192 (D.C.Cir.1986), a court must proceed with the utmost caution before concluding that one agency may not regulate merely because another may. *E.g., Galliano,* 836 F.2d at 1369-70 (relying on the First Amendment and the canon of constitutional doubt in holding that the Federal Election Campaign Act partially preempted the postal fraud prescriptions of 39 U.S.C. § 3005); *see also Pennsylvania v. ICC,* 561 F.2d 278, 292 (D.C.Cir. 1977) ("It is well established that when two regulatory systems are applicable to a certain subject matter, they are to be reconciled and, to the extent possible, both given effect."). In this case, while it may be true that the IAA and the FTC Act employ different verbal formulae to describe their antifraud standards, it hardly follows that they therefore impose conflicting or incompatible obligations. *See Radzanower,* 426 U.S. at 155, 96 S.Ct. at 1992-93 (repeals only implied to the extent necessary to make the later enacted law work). Undoubtedly, entities in appellants' position can – and of course should – refrain from engaging in both "unfair and deceptive acts or practices" *and* "any transaction, practice, or course of business which operates as a fraud or deceit upon a client or prospective client." The proscriptions of the IAA are not diminished or confused merely because investment advisers must also avoid that which the FTC Act proscribes. And, because these statutes are "capable of co-existence," it becomes the *duty* of this court "to regard each as effective" – at least absent clear congressional intent to the contrary. *Mancari,* 417 U.S. at 551, 94 S.Ct. at 2483.

Appellants can point to nothing in the background or history of the IAA that demonstrates (or even hints at) a congressional intent to preempt the antifraud jurisdiction of the FTC over those covered by the new statute. Nor does the subsequent case law interpreting these statutes contain such declarations. The closest case is perhaps *Spinner Corp. v. Princeville Develop. Corp.,* 849 F.2d 388, 392 n. 4 (9th Cir.1988), which notes that the "FTC has never undertaken to adjudicate deceptive conduct in the sale and purchase of securities, presumably because such transactions fall under the comprehensive regulatory umbrella of the Securities and Exchange Commission." Based on this observation, the court held that Hawaii's "baby FTC Act," which was patterned after the federal statute, did not regulate the purchase and sale of securities, despite language that would seem to include such activity. *See id.* Even if we agreed with the Ninth Circuit's dubious reasoning – which implies that because a power has not been exercised, the power does not exist – we simply do not think that such indicia of intent are enough to allow us to quash the FTC's subpoenas.

In sum, then, whatever the ultimate force of arguments about the structure of the IAA or the FTC's historical practice regarding securities transactions, neither of these are sufficiently forceful to deprive the Commission of its general prerogative to determine, at least in the first instance, the scope of its own investigatory authority.

### III. CONCLUSION

For the reasons given above, we hold that the FTC is entitled to enforce its CIDs against all four appellants in this case. Neither the Commodity Exchange Act nor the Investment Advisers Act evince an unambiguous intent to deprive the FTC of its otherwise applicable authority to investigate possibly deceptive advertising and marketing practices merely because those practices relate to either the commodities or the securities business.

Accordingly, the decision of the District Court is affirmed.

*So ordered.*