In the

# United States Court of Appeals
## For the Seventh Circuit
————————

No. 06-3495

UNITED STATES DEPARTMENT OF EDUCATION,

*Plaintiff-Appellee*,

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendant-Appellant*.

————————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:06-CV-01333—**John Daniel Tinder**, *Judge*.

————————

ARGUED FEBRUARY 23, 2007—DECIDED MARCH 21, 2007

————————

Before POSNER, KANNE, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The University of the District of Columbia is a member of the National Collegiate Athletic Association, and as such subject to its rules. A violation of an NCAA rule can impose heavy costs should it result in the imposition of sanctions on the violator. Typical sanctions, such as banning the violator from postseason competition or reducing its athletic scholarships, make a school less successful in postseason play, upon which the school's share of the television and other media revenues

that the NCAA obtains and doles out to its members primarily depends.

Member schools can minimize their punishment, however, by reporting their violations to the Association before it discovers them. UDC did this, reporting violations involving its basketball teams in the 2004-2005 season. The exact nature of the violations is unclear, but they seem to have included misuse of federal funds, and the Inspector General of the Department of Education began an investigation of that misuse. In the course of the investigation the Department issued a subpoena to the NCAA for documents that UDC had submitted, or the Association had prepared, in connection with the Association's investigation of UDC's self-reported violations. The Association moved to quash the subpoena or in the alternative for the protective order described below. The district court denied the motion; the Association appeals only from the denial of the protective order.

The Association acknowledges that compliance with the subpoena is not burdensome in the sense of imposing heavy costs of identifying, locating, copying, or transporting the documents to the Department of Education, that the documents sought are relevant to the Department's investigation, and that the Department is authorized by law to conduct such an investigation. But the Association argues that if the government can make unrestricted use of documents submitted to the Association in aid of the Association's own investigations, this will impede those investigations because whistleblowers will worry that if they inform to the Association their cover will be blown. This amounts to arguing that a private organization should have the right to impede government investigations because it wants to conduct its own investigations without

hindrance. To state the proposition is almost enough to refute it.

Of course there are privileges that can be used to keep information from government agencies and thus impede government investigations, such as the lawyer-client privilege. But there is no private-investigator's privilege. The lawyer-client privilege can embrace a lawyer's agents (including an investigator), for example when "the client in the first instance consults a lawyer who retains an accountant as a listening post." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (Friendly, J.); see also *United States. v. Haynes*, 216 F.3d 789, 793-94, 798 (9th Cir. 2000); *United States v. Alfonso*, 552 F.2d 605, 617 (5th Cir. 1977); *Parkman v. Arkansas*, 742 S.W.2d 927, 928-29 (Ark. 1988); *Flynn v. Superior Court*, 57 Cal. App. 4th 990, 992-96 (1997); cf. *United States v. Nobles*, 422 U.S. 225, 237-39 (1975) (work product). But there is nothing like that in this case.

There isn't even a reporter's privilege in federal cases. *Branzburg v. Hayes*, 408 U.S. 665 (1972); *University of Pennsylvania v. EEOC*, 493 U.S. 182, 201 (1990); *McKevitt v. Pallasch*, 339 F.3d 530 (7th Cir. 2003). The news media conduct investigations, and their ability to do so would be enhanced if they were permitted to conceal the identity of their sources from the government. But they are not.

So the NCAA has trimmed its sails, asserting in this appeal a right not to withhold documents from the government but instead to a protective order that will forbid the Department to show them to anyone without five days' advanced notice to the Association. During that cooling-off period the Association would go to the intended recipient of the documents (whom the Department would have to identify to the Association) and ask him to keep any sensitive information in the documents confidential. If he

refused or was unable to give adequate assurance of confidentiality, the NCAA would have a right to ask the court for a further protective order, of indefinite length, against the Department's turning over the documents.

That further order would be enforcing a privilege under a different name; the government would have physical possession of the documents but its ability to use them would be severely limited. Even the five-day cooling-off period would hamper the government's investigation because of the NCAA's implied threat to sue any intended recipient of documents if he refused to play ball with the Association. Imagine if the Department of Education intended to give documents that it had obtained from the NCAA to a Justice Department prosecutor for presentation to a grand jury. If the prosecutor decided to submit them to a grand jury over the Association's protests, the Association would bring suit to enjoin the submission. The suit, whatever its outcome, would impede the grand jury's investigation.

The Association was stung by a recent incident in which it received information from the head football coach at the University of Tennessee, Phillip Fulmer, concerning possible violations of NCAA rules by another university. It gave the information to a grand jury pursuant to subpoena. The information became public, precipitating a defamation suit against Fulmer and the NCAA seeking $60 million in damages. *Dagnan v. Fulmer*, No. 163126-3 (Knox Cty., Tenn., Chancery Ct., Nov. 21, 2005). The suit doesn't seem to be going anywhere. Defamation based on material contained in a response to a subpoena, as in other statements made in a judicial proceeding, *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 159 (Tenn. App. 1997); *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 137 (6th Cir. 1996)

(Tennessee law); *MacGregor v. Rutberg*, No. 06-2829, 2007 WL 582494, at *1 (7th Cir. Feb. 27, 2007), is absolutely privileged. *Boice v. Unisys Corp.*, 50 F.3d 1145, 1148-49 (2d Cir. 1995), as the trial court in the *Dagnan* case has ruled. *Dagnan v. Fulmer*, *supra*, at 9-14. (The suit remains pending on other grounds.) The "common interest" privilege, see, e.g., *Pate v. Service Merchandise Co.*, 959 S.W.2d 569, 576 (Tenn. App. 1996); *Kennedy v. Children's Service Society*, 17 F.3d 980, 985 (7th Cir. 1994); *Gumbhir v. Curators of University of Missouri*, 157 F.3d 1141, 1145 (8th Cir. 1998); *Catrone v. Thoroughbred Racing Associations of North America, Inc.*, 929 F.2d 881, 887-88 (1st Cir. 1991); *Restatement (Second) of Torts* § 596 (1977), is probably also applicable, since Fulmer and the NCAA have a common interest in NCAA members' complying with the Association's rules.

The existence of these privileges suggests that the Association's fears may be chimerical, and an additional reason for thinking that is the strong incentive of members to report their violations in order to take advantage of the partial amnesty that the Association gives self-reporting violators. (Granted, those incentives are diminished not only by the threat of a defamation suit but also by the fact that, the fewer whistleblowers there are, the less likely violators of the NCAA's rules are to be caught and so the less incentive they have to turn themselves in.)

There is a further reason to doubt the NCAA's need for the protective order that it is seeking. The Department of Education was not responsible for the subpoena in the *Fulmer* case. The Department does not want to kill the golden goose by promiscuously disclosing information it receives from the NCAA and by doing so deterring the reporting to the Association of violations of NCAA rules that may also violate the laws that the Department en-

forces. Granted, the Department of Justice, directed by the Inspectors General Act of 1978, 5 U.S.C. App. 3, § 6(e)(4), to promulgate guidelines for investigations by inspectors general, requires them to notify the Attorney General whenever they have reasonable grounds to believes there's been a violation of federal criminal law. Attorney General Guidelines for Offices of Inspector General with Statutory Enforcement Authority, § VII, at 4-5 (Dec. 8, 2003). But we have no authority to negate the regulation by creating a new privilege.

To the extent permitted by the regulation, the internal policies of the Department of Education seek to preserve informants' confidentiality. The NCAA argues that those policies are negated by the Freedom of Information Act, which, the Association contends, authorizes any member of the general public (and not just the Department of Justice, which like the Department of Education has an incentive to protect the confidentiality of informants) to get hold of documents in the possession of a government agency that identify whistleblowers. The relevance of this argument is unclear, because all the Association is seeking is an order limiting the Department's right to turn over the documents to others; until then, the documents are in the Department's possession and thus exposed to demands for disclosure under FOIA.

In any event, FOIA does not require (though neither does it forbid, *Chrysler Corp. v. Brown*, 441 U.S. 281, 290-94 (1979)) the government to disclose "records or information compiled for law enforcement purposes, . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institu-

tion *which furnished information on a confidential basis*." 5 U.S.C. § 552(b)(7)(D) (emphasis added). (There is a further exemption for "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," § 552(b)(6), and more extensive protection for the privacy of student records under the Privacy Act of 1974, § 552a(a)(5). But these provisions have no bearing on this case; the Department of Education is not seeking the kind of information that they protect.)

The NCAA argues that the phrase in section 7(D) that we have italicized will prevent the Department of Education from secreting the identity of sources of information in the subpoenaed documents because the sources did not furnish the information directly to the government on a confidential basis. The argument is unpersuasive; it is also contrary, one might have thought, to the NCAA's long-run interests. The part of the passage that we quoted from section 7(D) that begins with "including" implies only that a public or private institution that furnishes information to the government and wants the information kept confidential must so indicate; that is, it must furnish the information to the government "on a confidential basis." To be meaningful, the "confidential basis" must extend to the source of the institution's information. *Sands v. Murphy*, 633 F.2d 968, 970-71 (1st Cir. 1980); *Coleman v. FBI*, 13 F. Supp. 2d 75, 81-83 (D.D.C. 1998); *Kuehnert v. FBI*, 620 F.2d 662, 667 and n. 11 (8th Cir. 1980); see also *Ferguson v. FBI*, 83 F.3d 41, 43 (2d Cir. 1996) (per curiam); *Church of Scientology v. United States Department of Justice*, 612 F.2d 417, 426-27 (9th Cir. 1979). Who would cooperate with police if told that the police department could shield its own identity if it turned over the

information furnished to it to the federal government but not the informant's identity? And why would a law enforcement agency or other public agency want to conceal its own identity? Protecting that identity can't be the purpose of the "including" provision. The provision would have no domain if it did not protect indirect informers.

Yet could it not be argued that a private organization could never promise its informants confidentiality because the information could be subpoenaed from the organization? But confidentiality is always a matter of degree. An informant might wish the NCAA to conceal his identity to the extent the Association could do so, while realizing that there could be no absolute guarantee. Such information would be furnished to the Association on a confidential basis, and thus come within section 7(D)'s exemption from compulsory disclosure. The Association could remind any would-be informant that if he wanted his identity concealed to the extent that the Association could conceal it, he should make clear to the Association that he is submitting his information on a confidential basis.

However, in concluding that the NCAA has not made a case for the protective order/quasi-privilege that it is seeking, we do not rely, as the district judge did, on the distinction between an "administrative" and a "judicial" subpoena. Subpoenas ancillary to judicial proceedings are issued by courts, while subpoenas ancillary to administrative proceedings are often issued by the administrative agency directly. But that is not an interesting difference, because in either case the individual or organization that is subpoenaed can ask a court to quash the subpoena. 5 U.S.C. § 555(d); Fed. R. Civ. P. 45(3); Fed. R. Crim. P.

17(c)(2). There is a significant distinction toward which the distinction between "administrative" and "judicial" subpoenas may be gesturing, but it is the distinction between subpoenas issued in a lawsuit or administrative proceeding or targeted pre-enforcement investigation, on the one hand, and subpoenas issued pursuant to the broader investigative powers that some government agencies, but not private entities, possess. That distinction, however, cuts across the administrative/judicial divide. For example, the EEOC's "power to conduct an investigation can be exercised only after a specific charge has been filed in writing. In this respect the Commission's investigatory power is significantly narrower than that of the Federal Trade Commission or of the Wage and Hour Administrator, who are authorized to conduct investigations, inspect records, and issue subpoenas, whether or not there has been any complaint of wrongdoing." *EEOC v. Shell Oil Co.*, 466 U.S. 54, 63-65 (1984), quoting 110 Cong. Rec. 7214 (1964); see also *United States v. Morton Salt Co.*, 338 U.S. 632, 641-43 (1950); *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509-10 (1943); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 585-87 (D.C. Cir. 2001).

The distinction thus relates to the substantive scope of a subpoena, and so has no bite here because the Department of Education is operating well within the substantive scope of its investigative powers. See 5 U.S.C. App. 3 §§ 6(a)(2), (4). The issue in this case—whether the burden of compliance with the subpoena (unless there is a protective order) exceeds the need for the information sought in it—is remote from the distinction between administrative and judicial subpoenas. That leads us to wonder about the occasional judicial statements that an administrative subpoena, unlike a judicial subpoena, can

be quashed only if compliance would be "excessively burdensome so as to threaten the normal operation of the party's business." *Commodity Trend Service, Inc. v. CFTC*, 223 F.3d 981, 987 (7th Cir. 2000); see also *EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 651-54 (7th Cir. 2002); *NLRB v. American Medical Response, Inc.*, 438 F.3d 188, 192-93 (2d Cir. 2006). (Other cases do not distinguish between the two types of subpoena, so far as assessing burden is concerned. *SEC v. Arthur Young & Co.*, 584 F.2d 1018, 1023-24, 1032-33 (D.C. Cir. 1978); cf. *EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696, 700 (7th Cir. 2002).) It is true that the stakes in many government cases exceed those in most private cases. If the government is prosecuting a major criminal, information that it has subpoenaed for aid in the prosecution is likely to confer a greater public benefit than information sought in a run-of-the-mill tort case, and if so the target of the subpoena will have to demonstrate a greater burden of compliance in order to get it quashed. But this difference cuts across the distinction between administrative and judicial subpoenas. A prosecution is not an administrative proceeding; the subpoena is judicial. Even restating the distinction as one between public and private cases is unsatisfactory, since many private cases involve greater stakes than many public. In this case, in any event, the burden of compliance with the subpoena, even without a protective order to cushion the effect of compliance, is speculative and is outweighed by the investigatory needs of the Department of Education.

AFFIRMED.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*