In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-1605

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Applicant-Appellee,*

v.

SIDLEY AUSTIN BROWN & WOOD,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01-C-9635—**Joan Humphrey Lefkow**, *Judge.*

ARGUED SEPTEMBER 6, 2002—DECIDED OCTOBER 24, 2002

Before POSNER, EASTERBROOK, and DIANE P. WOOD, *Circuit Judges.*

POSNER, *Circuit Judge.* In 1999, Sidley & Austin (as it then was) demoted 32 of its equity partners to "counsel" or "senior counsel." The significance of these terms is unclear, but Sidley does not deny that they signify demotion and constitute adverse personnel action within the meaning of the antidiscrimination laws. The EEOC began an investigation to determine whether the demotions might have violated the Age Discrimination in Employment Act. After failing to obtain all the information it wanted without

recourse to process, the Commission issued a subpoena duces tecum to the firm, seeking a variety of documentation bearing on two distinct areas of inquiry: coverage and discrimination. The reason for the inquiry about coverage is that the ADEA protects employees but not employers. E.g., *Simpson v. Ernst & Young*, 100 F.3d 436, 443 (6th Cir. 1996); see 29 U.S.C. §§ 623(a)(2), (a)(3), 630(f). To be able to establish that the firm had violated the ADEA, therefore, the Commission would have to show that the 32 partners were employees before their demotion.

Sidley provided most of the information sought in the subpoena that related to coverage (but no information relating to discrimination, though Sidley claims that the demotions were due to shortcomings in performance rather than to age), but not all. It contended that it had given the Commission enough information to show that before their demotion the 32 had been "real" partners and so there was no basis for the Commission to continue its investigation. The Commission applied to the district court for an order enforcing the subpoena. The court ordered the firm to comply in full, and the firm appeals. The order to comply was a final order appealable under 28 U.S.C. § 1291 because it terminated the judicial proceeding. The only relief sought was enforcement of the subpoena, and so when enforcement was ordered the EEOC had gotten everything it wanted. *CFTC v. Collins*, 997 F.2d 1230, 1232 (7th Cir. 1993); *United States v. Construction Products Research, Inc.*, 73 F.3d 464, 469 (2d Cir. 1996).

The Commission also appears to be seeking information on whether Sidley may be forcing other partners whom the Commission suspects may also be employees within the meaning of the age discrimination law to retire on account of their age, contrary to the abolition of mandatory retirement by the age discrimination law. But the

parties appear to have assumed that if the 32 are (as Sidley contends) employers, so are all of Sidley's other partners. So we need not consider the mandatory-retirement issue separately.

The law firm's argument proceeds in three steps: (1) the question whether the 32 demoted partners are within the ADEA's coverage is a jurisdictional question, which once answered against the Commission requires that the investigation cease; (2) the target of a subpoena need comply only up to the point at which it has produced evidence that establishes that there is no jurisdiction; (3) the Commission has no jurisdiction in this case because a partner is an employer within the meaning of the federal anti-discrimination laws if (a) his income included a share of the firm's profits, (b) he made a contribution to the capital of the firm, (c) he was liable for the firm's debts, and (d) he had some administrative or managerial responsibilities—and all these things, the firm argues, have been proved.

The facts as developed so far reveal the following:

The firm is controlled by a self-perpetuating executive committee. Partners who are not members of the committee have some powers delegated to them by it with respect to the hiring, firing, promotion, and compensation of their subordinates, but so far as their own status is concerned they are at the committee's mercy. It can fire them, promote them, demote them (as it did to the 32), raise their pay, lower their pay, and so forth. The only firm-wide issue on which all partners have voted in the last quarter century was the merger with Brown & Wood and that vote took place after the EEOC began its investigation. Each of the 32 partners at the time of their demotion by the executive committee had a capital account with the firm, averaging about $400,000. Under the firm's rules, each was liable for the firm's liabilities in propor-

tion to his capital in the firm. Their income, however, was determined by the number of percentage points of the firm's overall profits that the executive committee assigned to each of them. Each served on one or more of the firm's committees, but all these committees are subject to control by the executive committee.

Sidley can obtain no mileage by characterizing the coverage issue as "jurisdictional." It is the law that the EEOC cannot protect employers; and it is also the law that like any agency with subpoena powers the EEOC is entitled to obtain the facts necessary to determine whether it can proceed to the enforcement stage. *EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 651 (7th Cir. 2002); *Commodity Trend Service, Inc. v. CFTC*, 233 F.3d 981, 986-87 (7th Cir. 2000); *SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047, 1052-53 (2d Cir. 1973). Among these are facts bearing on whether the 32 demoted partners were employees within the meaning of the age discrimination law. The Commission is entitled to the information that it thinks it needs in order to be able to formulate its theory of coverage before the court is asked to choose between the Commission's theory and that of the subpoenaed firm. Only if, as in *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490 (7th Cir. 1993), the information that the subpoenaed firm resists furnishing is not even arguably relevant, because it is evident at the outset that whether the agency has any business conducting the investigation depends on a pure issue of statutory interpretation, can the court resolve the issue then and there without insisting on further compliance with the subpoena. See also *EEOC v. Shell Oil Co.*, 466 U.S. 54, 64-65 (1984); *FTC v. Miller*, 549 F.2d 452, 460-61 (7th Cir. 1977); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 586-87 (D.C. Cir. 2001); *EEOC v. Karuk Tribe Housing Authority*, 260 F.3d 1071, 1076-77 (9th Cir. 2001); *EEOC v. Ocean City Police Dept.*, 820 F.2d

1378, 1380 (4th Cir. 1987) (en banc), vacated on other grounds, 486 U.S. 1019 (1988). The issue in *Great Lakes* was whether the Fair Labor Standards Act applies to game wardens on Indian reservations. If, as we held, it did not, the continued investigation of the wardens' employer was all burden and no benefit, making insistence on compliance with the Labor Department's subpoena unreasonable. See *EEOC v. United Air Lines, Inc., supra*, 287 F.3d at 653.

*Great Lakes* does not hold, as Sidley argues, that characterizing a threshold issue as "jurisdictional" takes a case out of the general rule (on which see *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 212-14 (1946); *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 508-09 (1943); *EEOC v. Peat, Marwick, Mitchell & Co.*, 775 F.2d 928, 930-31 (8th Cir. 1985); *FTC v. Ken Roberts Co., supra*, 276 F.3d at 585-87) that enforcement of a subpoena cannot be resisted on the ground that the information the agency is seeking would not justify an enforcement action. The cases are legion that there is no *general* exception to the rule for issues going to the agency's jurisdiction. See, e.g., *FTC v. Feldman*, 532 F.2d 1092, 1095-96 (7th Cir. 1976); *FTC v. Ken Roberts Co., supra*, 276 F.3d at 585-87; *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5-6 (1st Cir. 1996). As explained in *United States v. Construction Products Research, Inc., supra*, 73 F.3d at 470, "at the subpoena enforcement stage, courts need not determine whether the subpoenaed party is within the agency's jurisdiction or covered by the statute it administers; rather the coverage determination should wait until an enforcement action is brought against the subpoenaed party." Sidley gains nothing, therefore, from characterizing the coverage issue as jurisdictional, and so we need not decide whether the characterization is correct.

But the cases leave intact the principle that a subpoena may be challenged as unreasonable. And one basis on

which it may be found unreasonable is that, as in *Great Lakes,* the agency clearly is ranging far beyond the boundaries of its statutory authority. As the Supreme Court explained in *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950), "of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." In *Endicott Johnson Corp. v. Perkins, supra,* 317 U.S. at 509, the Court noted that "the evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose of the Secretary in the discharge of her duties under the Act, and it was the duty of the District Court to order its production for the Secretary's consideration"—implying therefore that had the evidence sought by the subpoena been "plainly incompetent or irrelevant to any lawful purpose," enforcement would have been denied. See also *United States v. Construction Products Research, Inc., supra,* 73 F.3d at 471.

*Great Lakes* was such a case; this one is not (not yet anyway, though it may become one, as we shall point out later). But the difference is not, as implied in *EEOC v. Karuk Tribe Housing Authority, supra,* 260 F.3d at 1077-78, that *Great Lakes* involved an issue of jurisdiction and this case a "mere" issue of coverage and that there should be a special rule if not for jurisdictional defects then at least for "patent" jurisdictional defects. "Patent" is important to the issue of reasonableness, but not "jurisdictional." The Commission has the same right to obtain information bearing on its jurisdiction as to obtain any other information that it needs in order to decide whether there has been a violation of one of the laws that it enforces, while the recipient of the subpoena has the same right to chal-

lenge the subpoena as unreasonable because of lack of coverage as it does to complain that the subpoena is unreasonable because the recipient is outside the agency's jurisdiction. Suppose Sidley were conceded to have only eight employees, when an employer must have at least 20 employees in order to be subject to the ADEA. 29 U.S.C. § 630(b). It would not follow that Sidley could not complain about the subpoena unless the issue were characterized as jurisdictional. The distinction for which *Karuk* contended would complicate litigation pointlessly by forcing judges to distinguish between jurisdictional and non-jurisdictional limitations on agencies' powers and to decide on which side of the line coverage issues belong. So, to repeat, whether the coverage issue in this case should be characterized as jurisdictional is irrelevant.

The case law dealing with challenges to subpoenas contains the statement that the EEOC's "investigative authority is tied to charges filed with the Commission; unlike other federal agencies that possess plenary authority to demand to see records relevant to matters within their jurisdiction, the EEOC is entitled to access only to evidence 'relevant to the charge under investigation.'" *EEOC v. Shell Oil Co., supra*, 466 U.S. at 64; see also *EEOC v. United Air Lines, Inc., supra*, 287 F.3d at 650. But this was said with reference to Title VII; the ADEA's grant of investigative authority to the Commission is not cabined by any reference to charges. 29 U.S.C. § 626(a); 29 C.F.R. § 1626. Anyway the Supreme Court has held that the Commission can file its own charges of violation of Title VII. *EEOC v. Shell Oil Co., supra*, 466 U.S. at 69-70. So it is doubly irrelevant that none of the 32 demoted partners has filed a charge.

A remarkable feature of the way the case has been argued is that neither party has addressed the question *why*

some or all members of partnerships should for purposes of the federal antidiscrimination laws be deemed employers and so placed outside the protection of these laws. That question might be avoidable if the laws contained an exemption for discrimination against partners; we might then simply look to the definition of the term in federal or state law. And if we looked there, we would find that Sidley was indeed a partnership and the 32 demoted partners were indeed partners before their demotion. Sidley has complied with all the formalities required by Illinois law to establish and maintain a partnership; the 32 were partners within the meaning of the applicable partnership law.

Although the EEOC does not concede that the 32 are bona fide partners even under state law, it is emphatic that their classification under state law is not dispositive of their status under federal antidiscrimination law. The antidiscrimination laws do not exempt partnerships from coverage (Sidley concedes that) or deny partners, as such, the protection of the laws. Employers are not protected by discrimination laws such as Title VII and the ADEA, but are partners employers? Always? Always for purposes of Title VII or the ADEA, or the other federal laws that prohibit employment discrimination? Statutory purpose is relevant. When the Supreme Court in *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997), was faced with the question whether "employee" in Title VII includes a former employee, it looked to "consistency with a primary purpose of antiretaliation provisions: Maintaining unfettered access to statutory remedial mechanisms. The EEOC quite persuasively maintains that it would be destructive of this purpose of the antiretaliation provision for an employer to be able to retaliate with impunity against an entire class of acts under Title VII." And when in *Papa v. Katy Industries, Inc.*, 166 F.3d 937 (7th Cir. 1999), we held

that, in deciding whether a firm has the minimum number of employees required for it to be covered by federal antidiscrimination law we would not pierce the corporate veil, we did so on the basis of "the policy behind the exemption for employers that have very few employees." *Id.* at 942.

An individual who was classified as a partner-employer under state partnership law might be classified as an employee for other purposes, including the purpose for which federal antidiscrimination law extends protection to employees but not employers. Against this conclusion it can be argued that partners should be classified as employers rather than employees for purposes of the age discrimination law because partnership law gives them effective remedies against oppression by their fellow partners, because partnership relations would be poisoned if partners could sue each other for unlawful discrimination, and because the relation among partners is so intimate that they should be allowed to discriminate, just as individuals are allowed to discriminate in their purely personal relations. This is not the occasion on which to come down on one side or the other of the issue, though we note that in *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984), the Supreme Court rejected the argument that the intimate nature of the partnership relation precludes a challenge under Title VII to a discriminatory refusal to promote an employee to partner.

But we do not understand how Sidley, without addressing the purpose of the employer exemption, can be so certain that it has proved that the 32 are employers within the meaning of the ADEA. They are, or rather were, partners, but it does not follow that they were employers. A firm that under pursuit by the EEOC on suspicion of discrimination redesignated its employees "partners" without changing the preexisting employment relation an iota

would not by doing this necessarily buy immunity, even if the redesignation sufficed to make them partners under state law.

This case is not as extreme; it does not involve relabeling. Yet it involves a partnership of more than 500 partners in which all power resides in a small, unelected committee (it has 36 members). The partnership does not elect the members of the executive committee; the committee elects them, like the self-perpetuating board of trustees of a private university or other charitable foundation. It is true that the partners can commit the firm, for example by writing opinion letters; but employees of a corporation, when acting within the scope of their employment, regularly commit the corporation to contractual undertakings, not to mention to tort liability. Partners who are not members of the executive committee share in the profits of the firm; but many corporations base their employees' compensation in part anyway, but sometimes in very large part, on the corporation's profits, without anyone supposing them employers. The participation of the 32 demoted partners in committees that have, so far as appears, merely administrative functions does not distinguish them from executive employees in corporations. Corporations have committees and the members of the committees are employees; this does not make them employers. Nor are the members of the committees on which the 32 served elected; they are appointed by the executive committee. The 32 owned some of the firm's capital, but executive-level employees often own stock in their corporations. We shall see that there is authority that employee shareholders of a professional corporation are still employees, not employers, for purposes of federal antidiscrimination law.

Particularly unconvincing is Sidley's contention that since the executive committee exercises its absolute pow-

er by virtue of delegation by the entire partnership in the partnership agreement, we should treat the entire partnership as if it rather than the executive committee were directing the firm. That would be like saying that if the people elect a person to be dictator for life, the government is a democracy rather than a dictatorship. The partners do not even elect the members of the committee. They have no control, direct or indirect, over its composition.

Perhaps the most partneresque feature of the 32 partners' relation to the firm is their personal liability for the firm's debts: not because unlimited liability is a sine qua non of partnership (there can be limited partnerships, and there are other business entities besides partnership that have unlimited liability—a sole proprietorship, for example), but because it is the most salient practical difference between the standard partnership and a corporation. Sidley does not have limited liability, and this means, by the way, that although under the firm's rules each partner is liable for the firm's debts only in proportion to his capital, a creditor of the firm could sue any partner for the entire debt owed it. Is this enough to pin the partner tail on the donkey? *Wheeler v. Hurdman*, 825 F.2d 257, 274-75 (10th Cir. 1987), comes close to saying it is; see also *Fountain v. Metcalf, Zima & Co., P.A.*, 925 F.2d 1398, 1400-01 (11th Cir. 1991). Yet it does not quite deny the necessity of considering other factors. And tugging the other way are *Strother v. Southern California Permanente Medical Group*, 79 F.3d 859, 866-68 (9th Cir. 1996) (interpreting a similar provision of state anti-discrimination law), and *Simpson v. Ernst & Young, supra*, 100 F.3d at 441-42. *Simpson* classified partners as employees in circumstances broadly similar to, though distinguishable from, those of the present case:

Simpson had no authority to direct or participate in the admission or discharge of partners or other firm personnel; participate in determining partners or other personnel compensation predicated upon performance levels, responsibility, and years of service with the firm, including his own; participate in the vote for the chairman or the members of the Management Committee; or participate in the firm's profits and losses or share in unbilled uncollected client accounts ("UBT's"). Simpson had no right to examine the books and records of the firm except to the extent permitted by the Management Committee. He was required to execute a will which mandated that his heirs accept as binding the accounts provided by Ernst & Young with no right of inspection or verification. He had no authority to sign promissory notes on behalf of the firm, or pledge, transfer, or otherwise assign his interest in the firm. He was refused access to data concerning various client accounts. He was denied participation in annual performance reviews and other indicia of partnership status.

In sum, the firm's business, assets, and affairs were directed exclusively by a 10 to 14 member Management Committee and its chairman. The Management Committee exercised exclusive control over the admission and discharge of all personnel, including Simpson. It could terminate employees without cause and without a right to appeal such decisions. The Management Committee unilaterally determined the compensation of all personnel, which authority was exercised and executed in total secrecy. Simpson and those similarly situated had no vote for the chairman or the members of the Management Committee. Instead, the Management Committee appointed its chairman and its chairman appointed the members of the Management Com-

mittee. "For all practical purposes [the court is quoting here from the district court's opinion], he was an employee with the additional detriment of having promised to be liable for the firm's losses. Ernst & Young was free to draft its Partnership Agreement and U.S. Agreement in such a way as to generate the belief in its employees that they enjoyed partnership status and to permit them to represent themselves as partners. However, because these individuals actually had no bona fide ownership interest, no fiduciary relationship, no share in the profits and losses, no significant management control, no meaningful voting rights, no meaningful vote in firm decisions, and no job security, they were not bona fide partners. Therefore Ernst & Young was obligated not to discriminate against them because of their age, sex, race, religion, national origin, or handicap."

The matter of liability for partnership debts illustrates the importance of referring the question whether a partner in a particular firm is an employer or an employee to statutory purpose. If implicit in the ADEA's exemption for employers is recognition that partners ordinarily have adequate remedies under partnership law to protect themselves against oppression (including age or other forms of invidious discrimination) by the partnership, then exposure to liability can hardly be decisive. These 32 partners were not empowered by virtue of bearing large potential liabilities! The 32 were defenseless; they had no power over their fate. If other partners shirked and as a result imposed liability on the 32, the 32 could not, as partners in a conventional partnership could do, vote to expel them. They had no voting power. What could be argued but is not is that because the *other* partners are potentially liable for the pratfalls of the 32, the partnership should have greater power over their employment than

if the firm were a corporation and so had limited liability. To repeat, the issue is not whether the 32 before their demotion were partners, an issue to which their liability for the firm's debts is germane; the issue is whether they were employers. The two classes, partners under state law and employers under federal antidiscrimination law, may not coincide.

The problem of line drawing presented by this case is not unique to employment. It arises whenever legal consequences turn on classification as partner versus employee, whether in tax and tort cases or in discrimination cases. See, e.g., *Armstrong v. Phinney*, 394 F.2d 661, 663-64 (5th Cir. 1968) (tax); *Davis v. Loftus*, 2002 WL 31031467 (Ill. App. Sept. 9, 2002) (tort liability). The law does not allow firms to obtain the benefits or avoid the costs associated with particular forms of doing business by simple re-designation. Of course firms have broad freedom of election among the different forms of doing business, such as the corporate, partnership, LLC, and so forth. Their freedom is not unlimited; there is, for example, the "substance over form" rule of tax law. See, e.g., *Yosha v. Commissioner*, 861 F.2d 494, 497-98 (7th Cir. 1988). But the question, as we have been at pains to emphasize throughout this opinion, is not whether Sidley is a partnership; it is. The question is whether, when a firm employs the latitude allowed to it by state law to reconfigure a partnership in the direction of making it a de facto corporation, a federal agency enforcing federal antidiscrimination law is compelled to treat all the "partners" as employers.

The same problem of the tyranny of labels arose when the Supreme Court had to draw the line in ERISA between an "employee," defined unhelpfully as in the ADEA as "any individual employed by an employer," 29 U.S.C. § 1002(6), and an independent contractor. The

Court could have said that an employee is anyone who is called an employee. Instead it said:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the project is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. Since the common-law test contains no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.

*Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 323-25 (1992) (citations and internal quotation marks omitted). In a subsequent case, we said the most important factor in deciding whether a worker was an employee or an independent contractor was the employer's right to control the worker's work. *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 438 (7th Cir. 1996). That is a potentially important factor here as well. Both decisions reject mechanical tests.

We can get a little help on the question in our case from Justice Powell's concurring opinion in *Hishon v. King &*

*Spalding, supra*, 467 U.S. at 79-81, one of the few discussions of the applicability of Title VII to partnerships. Here is what he said (*id.* at 79-80; record reference omitted):

> I write to make clear my understanding that the Court's opinion [holding discriminatory refusal to promote an associate to partner actionable] should not be read as extending Title VII to the management of a law firm by its partners. The reasoning of the Court's opinion does not require that the relationship among partners be characterized as an "employment" relationship to which Title VII would apply. The relationship among law partners differs markedly from that between employer and employee—including that between the partnership and its associates.[2] The judgmental and sensitive decisions that must be made among the partners embrace a wide range of subjects.[3] The essence of the law partnership is the common conduct of a shared enterprise. The relationship among law partners contemplates that decisions important to the partnership normally will be made by common agreement or consent among the partners.

---

2.    Of course, an employer may not evade the strictures of Title VII simply by labeling its employees as "partners." Law partnerships usually have many of the characteristics that I describe generally here.

3.    These decisions concern such matters as participation in profits and other types of compensation; work assignments; approval of commitments in bar association, civic, or political activities; questions of billing; acceptance of new clients; questions of conflicts of interest; retirement programs; and expansion policies. Such decisions may affect each partner of the firm. Divisions of partnership profits, unlike shareholders' rights to dividends, involve judgments

as to each partner's contribution to the reputation and success of the firm. This is true whether the partner's participation in profits is measured in terms of points or percentages, combinations of salaries and points, salaries and bonuses, and possibly in other ways.

Justice Powell was saying that a traditional law partnership, involving "the common conduct of a shared enterprise" and a relationship among the partners that "contemplates that decisions will be made by common agreement or consent among the partners," has a governance structure different from the one contemplated or assumed by Title VII. At the same time he was making clear that labeling an enterprise that does not have the structure, the character, of the traditional partnership will not immunize it from the statute. In a case in which we held that partners were employers for purposes of Title VII, the partnership was, so far as appears, an equal partnership of four partners. See *Burke v. Friedman*, 556 F.2d 867, 868 (7th Cir. 1977).

A functional approach need not always lead to an expansion in coverage. When physicians who were both the shareholders of a professional medical corporation and employees of the corporation argued that they were "really" employers for purposes of deciding whether the corporation had enough employees to come within the reach of the Americans with Disabilities Act, a panel of the Ninth Circuit, rejecting the "economic realities" test proposed by the dissent, refused to look behind the formal status of the medical personnel as employees and concluded that the corporation was indeed covered by the Act. *Wells v. Clackamas Gastroenterology Associates, P.C.*, 271 F.3d 903, 905-06 (9th Cir. 2001), cert. granted, 70 U.S.L.W. 3625 (U.S. Oct. 1, 2002); see also *Hyland v. New Haven Radiology Associates, P.C.*, 794 F.2d 793, 796-98 (2d Cir. 1986). Like the dissent in *Wells*, we had employed an "economic realities" test

to hold that a professional corporation could be treated as a partnership, *EEOC v. Dowd & Dowd, Ltd.*, 736 F.2d 1177 (7th Cir. 1984), and it could be argued that consistency precludes our rejecting the Commission's "economic realities" test in this case, at least at this early stage in the Commission's investigation. And even the majority in *Wells* stated that a firm could not, by affixing the label of "partner" to someone who was functionally an employee, avoid federal antidiscrimination law. *Wells v. Clackamas Gastroenterology Associates, P.C., supra*, 271 F.3d at 905.

All that is clear amidst this welter of cases is that the coverage issue in the present case remains murky despite Sidley's partial compliance with the subpoena. The Commission is therefore entitled to full compliance, at least with regard to coverage, unless the additional documents the Commission is seeking are obviously irrelevant. What the Commission particularly wants to know is how unevenly the profits are spread across the entire firm. Are profits so concentrated in members of the executive committee, or in some smaller or larger set of partners, in relation to the profits that the executive committee allocated to the 32, that the latter occupied the same position they would have if they had been working at a comparable rank for one of the investment banks that once were partnerships but now are corporations? This might not be decisive but it would bear on the unavoidably multifactored determination of whether this large law firm—which in recognition that conventional partnership is designed for much smaller and simpler firms has contractually altered the structure of the firm in the direction of the corporate form—should for purposes of antidiscrimination law be deemed the employer of some at least of the individuals whom it designates as partners.

But we think the district court was premature to order the subpoena complied with in its entirety. It is not only the law firm that has failed to argue the purpose of the exclusion of employers from the protection of the statute; it is also the EEOC. Without having proposed a standard or criterion to guide the determination, the Commission has not earned the right to force the law firm not merely to finish complying with the coverage portion of the subpoena but to go on and produce the voluminous and sensitive documentation sought relating to the question whether, if these 32 partners were employees, they were demoted on account of their age and therefore in violation of the age discrimination law. We are therefore vacating the district court's order and remanding the case with directions to order the law firm to comply fully with the part of the subpoena that requests documents relating to coverage, but upon completion of those submissions to make a determination whether the 32 demoted partners are arguably covered by the ADEA. If it is plain on the basis of uncontested facts that before their demotion the 32 were not employees and therefore were not protected by the Act, which would place the case under the principle of our *Great Lakes* decision, then, barring circumstances that we do not at present foresee, the court should excuse the firm from compliance with the part of the subpoena that requests documents relating to the merits.

We are not ruling that the 32 demoted partners were in fact employees within the meaning of the age discrimination law. Such a ruling would be premature. Sidley has respectable arguments on its side, not least that the functional test of employer status toward which the EEOC is leaning is too uncertain to enable law firms and other partnerships to determine in advance their exposure to discrimination suits—that it would be better if the courts and the Commission interpreted the employer exclusion

to require treating all partners as employers, with per-haps a narrow sham exception. These issues will become ripe when Sidley finishes complying with the coverage part of the subpoena. We hold only that there is enough doubt about whether the 32 demoted partners are covered by the age discrimination law to entitle the EEOC to full compliance with that part, at least, of its subpoena.

VACATED AND REMANDED WITH DIRECTIONS.

EASTERBROOK, *Circuit Judge*, concurring in part and concurring in the judgment. I join my colleagues' exemplary discussion of the law governing agency subpoenas (slip op. 3-7) but otherwise concur only in the judgment. I do not think that the scope of the ADEA'S coverage is as unfathomable as the majority makes out, nor do I believe that *if* the law were so ambulatory we should punt the legal question to the district court. Instead we should do our best to reduce uncertainty. Sidley and other large partnerships need to plan their affairs; their members also need to know their legal status. Can large law firms adopt mandatory-retirement rules? It is disappointing that the EEOC should profess, some 30 years after the ADEA's enactment, that it hasn't a clue about the answer. My colleagues' opinion does not help matters, and this is a missed opportunity.

The ADEA's definition of "employee" has a circular quality:

> The term "employee" means an individual employed by any employer except that the term

> "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policymaking level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency, or political subdivision. The term "employee" includes any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country.

29 U.S.C. §630(f). Yet this does not condemn us to wandering forever through the mist like the Flying Dutchman. The ADEA was interpolated into the Fair Labor Standards Act, and its definition of employee tracks the FLSA's. 29 U.S.C. §203(e). It turns out to be a definition in wide use. Language essentially identical to the first clause of §630(f) appears in the National Labor Relations Act, 29 U.S.C. §158(b)(4)(i); the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §402(f); the Employee Retirement Income Security Act, 29 U.S.C. §1002(6); the Family and Medical Leave Act, 29 U.S.C. §2611(3) (incorporating §203(e)); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(f); and the Americans with Disabilities Act, 42 U.S.C. §12111(4). This means on the one hand that a search for legislative purpose is futile—Congress took off the rack language devised, and often used, for subjects other than employment discrimination—and on the other hand that a definition may be secured from opinions that have addressed these other statutes. For example, in *Hishon v. King & Spalding*, 467 U.S. 69 (1984), all of the Justices assumed—and Justice Powell in con-

currence was explicit—that a *bona fide* partner of a large law firm is not an "employee" for purposes of Title VII. More recently, when dealing with ERISA, the Court held unanimously that the definition's circularity should be fixed by incorporating into federal law the traditional state agency-law criteria for identifying master-servant relations. *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 322-27 (1992).

*Darden* turned on the distinction between an employee and an independent contractor. As they had done when resolving a similar problem in copyright law, see *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), the Justices looked to the approach in the *Restatement (Second) of Agency* §220(2) (1958). We have done the same in cases arising under other federal statutes that have circular definitions of "employee." See, e.g., *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 437-39 (7th Cir. 1996). Likewise we have drawn from state-law principles—such as the rule that corporate form must be respected—to determine whether an "employer" has enough "employees" to come under a federal statute. See, e.g., *Papa v. Katy Industries, Inc.*, 166 F.3d 937 (7th Cir. 1999). As *Darden* recognized, these bodies of law contain some flexible elements but give ready answers for the great majority of situations.

So too with partnership law. No one believes that a *bona fide* partner is in a master-servant relation with the partnership, or that the partner "is employed by" the partnership. The qualification "*bona fide*" is important; as Justice Powell observed in *Hishon*, an employer may not evade obligations under federal law by plastering the *name* "partner" on someone whose legal and economic characteristics are those of an employee. See also *Restatement (Third) of Agency* §1.02 (T.D. 2, 2001) (parties' labels

do not control). But if a person has those attributes that differentiate "partners" from "employees" in normal legal usage, then *Darden* classifies that person as a non-employee for purposes of a federal statute such as §630(f). It is neither our duty, nor our privilege, to invent a federal law of employment relations, as my colleagues appear to believe. The law must be federal (because §630 is a federal statute), but *Darden* tells us that federal law tracks ordinary principles of master-servant relations that come from state law.

Were the 32 lawyers *bona fide* partners? The majority all but concedes that they were. If this had been a suit under the diversity jurisdiction, and we needed to decide whose citizenship counted for purposes of the rule that a partnership has every partner's citizenship, see *Carden v. Arkoma Associates*, 494 U.S. 185 (1990), we would have acknowledged that all 32 were partners by normal reckoning. We know that all 32 (i) received a percentage of Sidley's profits and had to pony up if Sidley incurred a loss; (ii) had capital accounts that were at risk if the firm foundered; and (iii) were personally liable for the firm's debts and thus put their entire wealth, not just their capital accounts, on the line. We also know that (iv) no non-partner has an equity interest in the firm. The most important of these is the first (which implies the third): under the Uniform Partnership Act, it is profit-sharing (coupled with the lack of organization as an entity under some other law) that *defines* a partnership and identifies its partners, all of whom are personally liable for the venture's debts. See *Uniform Partnership Act* §202 (1997 rev.); see also Daniel S. Kleinberger, *Agency, Partnerships, and LLCs* §7.2.1 (2d ed. 2002). Illinois, which has enacted the model act into positive law, treats participation in profits as the defining characteristic of a *bona fide* partner. The court in *Davis v. Loftus*, 2002 WL 31031467 (Ill. App. 1st Dist.

Sept. 9, 2002), held that a partner who shares in the profits or loss is personally liable for the law firm's debts, while an "income partner" who receives a salary plus a bonus is an employee and not liable for the firm's debts.

The 32 lawyers were real partners and consequently not "employees." My colleagues' suggestion that one can be a partner under normal agency principles and still be an "employee" because of a federal-law override is incompatible with *Darden*. Anyway, it makes both linguistic and economic sense to say that someone who is liable without limit for the debts of an organization is an entrepreneur (a principal) rather than an "employee" (an agent). Unlimited liability and profit-sharing give each partner an interest in monitoring (and if need be expelling) those other partners who are shirking or otherwise not carrying their part of the load. Their actions in this respect are those of owners. Cf. Eugene F. Fama & Michael Jensen, *Separation of Ownership and Control*, 26 J.L. & Econ. 301, 315-17 (1983); Fama & Jensen, *Agency Problems and Residual Claims, id.* at 327, 334-36.

Perhaps each practice group at a large firm is best viewed as a distinct venture, and the umbrella organization (run by the Executive and Management Committees at Sidley) as a partnership of partnerships. The top committees can make all decisions, but much power is bound to be delegated, just as departments at a university make their own hiring and salary decisions even though a self-perpetuating board of trustees holds all the legal authority. Membership on an academic department's appointments committee is a position of real influence and responsibility even though the trustees formally make all appointments. See *NLRB v. Yeshiva University*, 444 U.S. 672 (1980) (holding that all faculty members are managers for purposes of federal labor law even though they lack any legal instru-

ments of control). So too within the judiciary: committees of the Judicial Conference effectively make many of the most important administrative decisions although committee members do not sit on the Conference. Doubtless things work similarly at large law firms, so my colleagues ought not sneeze at Sidley's observation that all 32 demoted partners served on committees. But the relation between practice groups and the whole firm, and the allocation of managerial authority among the lawyers, do not matter to classification: a member of a large partnership including smaller associations remains a partner rather than an employee in both economic and legal senses. My colleagues tellingly do not cite a single state case, or any scholarly commentary, restatement, or model code, for the proposition that concentration of decision-making authority within an entity alters the legal status of those who share profits and bear all residual risk of loss.

What leads me to concur in the judgment is not any doubt about the right characterization of the 32 demoted partners but uncertainty about that of other lawyers. Sidley has a retirement age for everyone it dubs a partner. Whether this is lawful can be determined only by classifying, as "employee" or not, *every* lawyer who carries a "partner" label. The EEOC is entitled to investigate without knowing in advance how the inquiry will come out. It may well be that Sidley designates as "partners" lawyers who are paid straight salaries plus bonuses rather than a portion of the profit (or loss) set *ex ante*. Unlike my colleagues, I do not read the EEOC's brief as conceding that all of Sidley's members are just like the 32 about whom Sidley has provided information. How could the EEOC tell at this stage whether the 32 are a representative sample? It wants to know whether some "partners" are paid entirely on the basis of guarantees (that is, salaries) or have compensation packages slanted so heavily toward

the guarantee that they would not be liable for the firm's debts. The EEOC also seeks to learn whether all partners have capital accounts at risk as the demoted 32 did. These are things that the EEOC is entitled to find out for everyone covered by the mandatory-retirement policy.

What is more, *EEOC v. Dowd & Dowd, Ltd.*, 736 F.2d 1177, 1178 (7th Cir. 1984), appears to commit this circuit to the view that state law forms don't matter, and that a federal court must assess for itself the question whether the "economic realities" demonstrate the existence of an employment relation. I say "appears to" not only because *Dowd* precedes *Darden* but also because any reference to "economic realities" poses the question *which* of many realities will be selected as those that matter. Maybe all that *Dowd* shows is that our court seeks to search out those realities that matter under ordinary agency law, and to look past veneers that lack legal or economic significance. That would align *Dowd* with Justice Powell's concurring opinion in *Hishon*, on which the panel in *Dowd* relied. But there would be little point in revisiting the matter today, because the Supreme Court will decide this Term whether *Dowd* is correct. The ninth circuit in *Wells v. Clackamas Gastroenterology Associates, P.C.*, 271 F.3d 903 (2001), cert. granted, No. 01-1435 (U.S. Oct. 1, 2002), rejected both the method and the outcome of *Dowd*, and the grant of certiorari enables the Supreme Court to resolve some or all of the problems that govern the classification of Sidley's members.

*Dowd* held that classification of a person as an "employee" under state law must be disregarded, for purposes of federal law, when the corporation is closely held—a professional corporation that differs from a partnership (beyond matters of form) only in the extent to which the members are personally liable for the firm's debts. *Clackamas* held,

to the contrary, that any person classified as an employee for purposes of state law necessarily is an employee for purposes of federal law. *Dowd* has at least the virtue of symmetry; it *always* looks through state-law forms (though I confess unease about what *Dowd* identifies as the legally important "realities"; professionals who are not personally liable for debts lack one of the principal attributes of partners). *Clackamas*, by contrast, states only a rule of inclusion: one can become an "employee" by virtue of state law even if one has all of the attributes that agency law associates with being an independent contractor or a partner, but a classification as a "partner" or "independent contractor" under state law is never conclusive in the employer's favor. This is not *Darden*'s approach (nor did the ninth circuit cite *Darden* or *Reid*). If we are to use ordinary agency-law principles to identify an "employee," we should be consistent. The ninth circuit, though, has a thumb on the scale in favor of classification as an "employee."

*Darden* is not alone in preferring symmetry. For example, *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997), holds that an ex-employee is an "employee" for some purposes under Title VII without regard to classification under state law, and *Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202 (1997), holds that for purposes of determining whether the employer exceeds the statutory size threshold an "employee" is a person on the firm's payroll at a given time, whether or not that person is paid for the date used in measurement. Both *Robinson* and *Walters* adopt rules that attach consequences to particular attributes, without asking what names state law (or particular employers) give to those attributes. Likewise with the question whether a person who shares in a venture's profits and losses and has unlimited personal liability for the enterprise's debts is an employee. We should

ask not what the organization, or any given state, *calls* this person; we should ask how this set of attributes is classified under the prevailing law of agency. I think it very likely that the 32 lawyers Sidley demoted would be classified as partners rather than employees under this body of rules, but I do not know how Sidley's other lawyers should be classified, so a remand is in order. Enforcing those aspects of the subpoena that call for information relevant to the merits would be unduly burdensome until this task has been completed, and unless the evidence then shows that Sidley has classified as "partners" some persons who are employees under ordinary agency principles.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*