In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3274

RICHARD A. SCHMIDT, M.D.,

*Plaintiff-Appellant,*

*v.*

OTTAWA MEDICAL CENTER, P.C.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00-C-7973—**Elaine E. Bucklo**, *Judge.*

ARGUED OCTOBER 28, 2002—DECIDED MARCH 5, 2003

Before KANNE, DIANE P. WOOD, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.* Does Dr. Richard A. Schmidt's status as a shareholder-director in a closely held professional corporation preclude him from being considered an "employee" entitled to bring suit under the Age Discrimination in Employment Act? Applying a functional "economic realities" test, which this Court adopted in *EEOC v. Dowd & Dowd, Ltd.*, 736 F.2d 1177, 1178 (7th Cir. 1984), and recently discussed in *EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696 (7th Cir. 2002), the district court interpreted the relationship between Dr. Schmidt and Ottawa Medical Center as more like that of a partner to a partnership, rather than that of an employee to an

employer. As such, the district court held that Dr. Schmidt could not entertain suit under the ADEA and granted summary judgment in favor of Ottawa Medical Center. Dr. Schmidt appeals, arguing that the economic realities dictate that he be treated as an employee under the Act. We affirm.

## HISTORY

Ottawa Medical Center ("OMC") was originally incorporated under the Illinois Medical Practice Act, before it reorganized itself in 1969 as a professional corporation under the Illinois Professional Service Corporation Act. 805 ILCS 10/1 *et seq*. (2002). Dr. Schmidt, a family practice physician, began his practice with OMC in 1966 and, upon OMC's reorganization, became a founding shareholder. He has remained a shareholder at all relevant times since.

Including Dr. Schmidt, there are eight shareholder-physicians of OMC. Each has the right to an equal vote on shareholder-physician compensation plans, on proposed amendments to employment agreements, on the hiring of nonshareholder-physicians,[1] and any other matter put to shareholder vote. While being a shareholder-physician of OMC, Dr. Schmidt has also frequently served as one of its corporate officers, holding at different times vice-presidential and secretarial positions. Most recently in 1997, Dr. Schmidt was the corporation's secretary. During those periods that he was a corporate officer, Dr. Schmidt also had a seat on OMC's board of directors. And in March 2000, the shareholders voted to amend OMC's

---

[1] Besides the eight shareholder-physicians, there were at the time of the complaint three nonshareholder-physicians and sixty-five nonphysician employees working at OMC. Their status under the Act is not at issue here.

bylaws to provide that all shareholders, by virtue of their shareholder status, would be directors of the corporation. Accordingly, Dr. Schmidt is once again a director of OMC.

OMC compensates its shareholder-physicians in two ways. First, every shareholder-physician has executed employment agreements with OMC. Under his 1976 employment agreement, Dr. Schmidt draws a base salary of $3700 a month. Second, each shareholder-physician is also eligible to share in OMC's profits via shareholder compensation in addition to whatever base salary his or her employment contract provides.

The formula for determining the amount of that additional compensation has been amended multiple times by the shareholder-physicians, and Dr. Schmidt has had the opportunity to vote on each of those proposals. Most recently in December 1999, the shareholder-physicians considered a plan whereby a shareholder-physician's compensation would equal his or her net medical receipts after deducting his or her pro rata share of overhead expenses, pension allocation, and profit-sharing contributions. Because Dr. Schmidt's net medical receipts would not have entitled him to any additional compensation under the proposed plan, he voted against it. He lost. Moreover, a majority of shareholder-physicians voted in 2000 to adopt new "Shareholder Employment Agreements" to supercede their outstanding employment agreements with OMC. Every shareholder-physician besides Dr. Schmidt has since entered into this new agreement. As a result of the new compensation structure, Dr. Schmidt has since drawn only the $3700-per-month base salary.

## ANALYSIS

An appellate court reviews summary-judgment motions de novo, viewing the record and all inferences from it in

the light most favorable to the nonmoving party. *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 370 (7th Cir. 1992). Summary judgment is appropriate only when there is no genuine issue as to any material fact and where the moving party is entitled to judgment as a matter of law. *Id.* Here, no material facts are in dispute; the parties contest only whether the facts require Dr. Schmidt to be treated as an "employee" of OMC for purposes of the ADEA.

The ADEA unhelpfully defines "employee" as "an individual employed by an employer," and an "employer" as "a person . . . who has twenty or more employees." 29 U.S.C. § 630(f), (b) (2002). To determine whether an organization has enough "employees" to qualify as an "employer" under the ADEA, we have already decided that the economic realities of the workplace, rather than mechanical adherence to state-law corporate forms, shall define the relationship between the parties. *EEOC v. Dowd & Dowd, Ltd.*, 736 F.2d 1177, 1178 (7th Cir. 1984). In *Dowd*, we found that the "role of a shareholder in a professional corporation is far more analogous to a partner in a partnership than it is to the shareholder of a general corporation." *Id.* We noted that "the economic reality of the professional corporation in Illinois is that the management, control, and ownership of the corporation is much like the management, control, and ownership of a partnership." *Id.* Since we did not consider bona fide partners as employees for purposes of Title VII actions, *see Burke v. Friedman*, 556 F.2d 867, 869 (7th Cir. 1977) ("[W]e do not see how partners can be regarded as employees rather than as employers who own and manage the operation of the business."), we saw no reason to treat professional-corporation shareholders differently, and thus determined that those shareholders should be excluded from the ADEA employee count. *Dowd*, 736 F.2d at 1177.

We must now decide whether *Dowd* applies when we are asked to classify an individual shareholder-claimant as an "employee" entitled to bring suit under the Act. If it does, and if "economic realities" control here as well, we must then ask, does *Dowd* require us always to treat Illinois professional-corporation shareholders as employers? If not, what factors will determine the actual role of the claimant-shareholder in the operations of the involved entity? *See Fountain v. Metcalf, Zima & Co.*, 925 F.2d 1398, 1400-01 (11th Cir. 1991).

We recently asked similar questions in *EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696 (7th Cir. 2002), where we held that the EEOC was entitled to continued enforcement of ADEA-coverage-related requests in a subpoena, when those requests could not be deemed unreasonable given continuing doubt over whether 32 demoted partners should be deemed bona fide partners (and thus employers) or de facto employees of a law firm in which ultimate decisionmaking authority rested solely with a few überpartners. In so ruling, we expressly refused to decide the question of the 32's status, noting that while they possessed many qualities indicative of bona fide partners in a partnership under Illinois law (that is, their income included a share of firm profits, they made capital contributions to the firm, they were liable for firm debts, and they had some administrative or managerial responsibilities), their individual fates at the firm were controlled entirely by a self-perpetuating executive management committee, which on a whim could fire, promote, demote, or raise and lower the pay of the 32. *Id.* at 699, 703.

Although we reserved the question of the 32's status, had we been prepared to accept a mechanical test—that the use of the partnership form as recognized under Illinois state law precluded finding the 32 as anything but partners and, thus, employers under the Act—there would

have been no need to continue the EEOC's investigation into the circumstances of the 32's actual role in the firm. *Id.* at 707 (listing additional information sought by the EEOC that "would bear on the unavoidably multifactored determination" of whether the 32 should be treated as employers or employees). Our holding in *Sidley*, therefore, must be read to apply *Dowd*'s functional test of employee status to determinations of whether an individual claimant qualifies as an employee under the ADEA.[2]

What remains is deciding which factors, in what we anticipated would be a multifactored analysis, *see id.* at 18, shall be important to determine whether Dr. Schmidt should be treated as an employer or an employee. *Dowd* provides little guidance—there, we matter-of-factly observed that "the economic reality of the professional corporation in Illinois is that the management, control, and ownership of the corporation is much like the management, control, and ownership of a partnership." *Dowd*, 736 F.2d at 1178. While that may be true, as we observed in *Sidley*, all partnerships are not created equal, and, because of this, all partners may not always be employers for purposes of the federal-discrimination statutes. *Sidley*, 313 F.3d at 702; *see also Burke*, 556 F.2d at 869 (finding only *bona fide* partners exempt from the federal-discrimination statutes). We will not, therefore, interpret *Dowd* to require us always to treat shareholders in Illinois professional corporations as employers; such a result would stand *Dowd* on its head, favoring, in the end, labels over realities.

---

[2] We are not the first circuit to follow *Dowd* to this conclusion. *See Fountain v. Metcalf, Zima & Co.*, 925 F.2d 1398, 1400-01 (11th Cir. 1991) (holding that a plaintiff shareholder in a professional corporation of accountants was akin to a partner, precluding his status as an "employee"); *cf. Devine v. Stone Leyton & Gershman, P.C.*, 100 F.3d 78, 80-81 (8th Cir. 1996) (following *Dowd* to determine employee count).

If not to *Dowd*, then where are we to look? An exhaustive discussion of the relevant case law in *Sidley* revealed alternate lines of precedent suggesting this multi-factored analysis could be conducted either with an eye towards statutory purpose, *see Sidley*, 313 F.3d at 702 (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (looking to "consistency with a primary purpose of anti-retaliation provisions" in deciding whether former employees were "employees" under Title VI)), or under the general common law of agency, *see id.* at 705 (citing *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 323-25 (1992) (resolving the circularity of ERISA's definition of "employee" by incorporating into federal law common-law agency criteria for identifying master-servant relations)). But we could not fairly decide which approach should govern on the facts of the case then before us: our task was only to decide whether continued enforcement of the coverage-related requests in the EEOC's subpoena was justified. The observation that the law regarding coverage was unsettled led us to conclude that the EEOC was entitled to investigate the issue further. *Id.* at 707.

The Supreme Court may ultimately resolve this tension between statutory purpose and agency principles since it has granted certiorari in *Wells v. Clackamas Gastroenterology Assoc.*, in which the Ninth Circuit rejected *Dowd*'s economic-realities test in holding that the conscious adoption of the corporate form dictated that shareholder-physicians in closely held professional corporations be treated as employees. 271 F.3d 903, 905 (9th Cir. 2001), *cert. granted* 123 S. Ct. 31 (2002). Citing the "broad purpose" of the federal employment-discrimination statutes, the Ninth Circuit refused to allow the shareholders to reap the tax, employment benefits, and civil-liability advantages of the corporate form, while avoiding federal employment-discrimination liability by asserting that they were *really* partners in a

partnership. *Id.* (citing *Hyland v. New Haven Radiology Assocs.*, 794 F.3d 793, 796 (2d Cir. 1986) (rejecting *Dowd*)). But the Ninth Circuit admitted it would not in all instances adhere mechanically to state-law forms: echoing Justice Powell's concurrence in *Hishon v. King & Spalding*, 467 U.S. 69 (1984), it would not allow a firm to avoid liability for discrimination by labeling the bulk of its employees "partners". *Clackmas*, 271 F.3d at 905; *see also Hishon*, 467 U.S. at 79 n.2 (Powell, J., concurring) ("[A]n employer may not evade the strictures of Title VII simply by labeling its employees as 'partners.'"). The Ninth Circuit did not discuss what approach it would take to separate true partners from fake ones, nor did it discuss the presumption announced in *Darden* that traditional agency principles define who is an employee unless Congress speaks otherwise. *Sidley*, 313 F.3d at 711 (Easterbrook, J., concurring).[3]

---

[3] The question in *Darden* was whether the claimant should be classified as an employee or an independent contractor for ERISA purposes. And like they had done elsewhere when "Congress has used the term 'employee' without defining it," *see*, *e.g.*, *Cmty. for Creative Non-violence v. Reid*, 490 U.S. 730, 739 (1989) (Copyright Act of 1976, 17 U.S.C. § 101); *Kelly v. S. Pac. Co.*, 419 U.S. 318, 322-23 (1974) (Federal Employers Liability Act, 45 U.S.C. §§ 51-60); *Baker v. Tx. & Pac. R.R. Co.*, 359 U.S. 227, 228 (1959) (same), the Justices "concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." *Darden*, 503 U.S. at 322-23. The Court rejected the lower court's argument that the term should be defined in light of the purposes of the Act. *Id.* at 324. Although the Court had previously taken this approach in defining "employee" for purposes of the National Labor Relations Act, *see NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 120-29 (1944), and the Social Security Act, *United States v. Silk*, 331 U.S. 704, 713 (1947) (construing the term "in the light of the mischief to be corrected and the end to be attained"), the

(continued...)

In any event, we need not attempt to resolve this tension here. It makes little difference in this case whether we are guided in our analysis of the economic realities by adherence to common-law agency principles or by attention to statutory purpose. Under either approach, we must conclude that Dr. Schmidt's shareholder-physician role was akin to that of a bona fide partner-employer rather than that of an employee.

It is beyond reproach that both agency-law principles and statutory purpose would consider control over employment opportunities to be a relevant factor. Certainly, in describing the master-servant relationship, agency law focuses on control: The defining characteristic of the master-servant relationship is the possession in the one of the right to control the work of the other. That is, "the relation presupposes the right of the master to have the work executed in such manner as he directs and a correlative duty on the part of the servant to perform as expressly or impliedly directed by the master." HAROLD GILL REUSCHLEIN ET AL., THE LAW OF AGENCY AND PARTNERSHIP at 102 (2d ed. 1990). Conversely, "[t]he essence of [a] partnership is the common conduct of a shared enterprise," and as a result the recognition that decisions important to that enterprise are made by common agreement. *Hishon*, 467 U.S. at 79-80 (Powell, J.,

---

[3] (...continued)
Court noted that after each decision was announced, Congress had amended the statute at issue to clarify that it had meant for traditional common-law agency principles to govern the term's definition. *Darden*, 503 U.S. at 324. That circumstance brought about the conclusion in *Darden* that the agency-law presumption announced in *Reid* in the wake of Congress's action in response to *Hearst* and *Silk* had "signaled [the Court's] abandonment" of the purposes-focused analysis of the earlier cases. *Id.* at 325.

concurring). Which is to say, *the sharing of the control* of the enterprise, and by extension each other's fate in it, is the sine qua non of partnership. REV. UNIF. PARTNERSHIP ACT § 202(a), cmt. (1997) ("[T]he attribute of co-ownership distinguishes a partnership from a mere agency relationship . . . . Ownership involves the power of ultimate control. To state that partners are co-owners of a business is to state that they each have the power of ultimate control." (citing UNIF. PARTNERSHIP ACT § 6(1) cmt.)).

As for statutory purpose, the Supreme Court has opined that the congressional intent behind the federal antidiscrimination laws was to prohibit those entities where "control over access to the job market may reside" from "exerting any power [they] may have to foreclose, on invidious grounds, access by an individual to employment opportunities otherwise available to him." *Ex rel. Doe v. St. Joseph's Hosp.*, 788 F.2d 411, 422-23 (7th Cir. 1986) (discussing *Sibley Mem. Hosp. v. Wilson*, 488 F.2d 1338, 1340-1341 (D.C. Cir. 1973)). Perhaps it was this recognition of statutory purpose that led Justice Powell to conclude in *Hishon* that bona fide partners cannot be considered "employees" for purposes of Title VII because a relationship among the partners that "'contemplates that decisions will be made by common agreement or consent . . . ,' has a *governance structure different from one contemplated or assumed* by Title VII." *Sidley*, slip op. at 17 (emphasis added) (quoting *Hishon*, 467 U.S. at 79-80 (Powell, J., concurring)).

Here, Dr. Schmidt throughout his career has shared in the management and control of OMC. He was a founding shareholder-physician of the corporation and has remained one at all relevant times since. During most of the last decade he was also a corporate officer and held a seat on OMC's board, and he once again holds a director's seat now by virtue of his enduring status as a shareholder. As a shareholder, he possesses an equal vote in

all matters put to shareholder vote, including the hiring of nonshareholder-physicians and shareholder compensation. Presumably as a director, he has in the past and now also enjoys a voice in all matters put before the board. Throughout his relationship with OMC and continuing to the present day, Dr. Schmidt thus has had ample opportunity to share in the management and control of OMC.

And the mere fact that lately his preferences on shareholder-compensation proposals have not secured the majority opinion of his fellow shareholders does not alter the fact that with each vote he has exercised this right to control. Even though Dr. Schmidt rejected the current plan because he would be affected adversely by its passage, he nevertheless had the opportunity to participate in revising and voting on it. It is hornbook law that majority rules dictate the governance of partnerships (in the absence of an act in contravention of the partnership agreement or extraordinary matters), and thus partnership law anticipates that individual partners may be bound by adverse majority decisions of the partnership as a whole. REUSCHLEIN ET AL., *supra*, at 276. It is common for partners to vote on compensation that reflects each partner's economic contributions to the firm. *See Hishon*, 467 U.S. at 79 n.3 (Powell, J., concurring) ("Divisions of partnership profits, unlike [common] shareholders' rights to dividends, involve judgments as to each partner's contribution to the reputation and success of the firm."). That appears to be what has happened in this case.

Against this conclusion, Dr. Schmidt argues that his employment agreement, which repeatedly refers to him as an employee, signifies a relinquishment of control over his employment since, among other things, it vests sole authority of patient assignment in OMC's board. But Dr. Schmidt is also a member of the board, which

confers upon him decisionmaking authority with respect to these matters, including patient assignments. Moreover, his employment agreement vests in him absolute authority for the treatment of his patients once assigned to him. Therefore, while Dr. Schmidt may not possess sole authority over the conditions of his employment (that is, he only shares that complete authority in equal parts with other members of the board), he does exercise significant control. And since each of the seven other shareholder-physicians are governed by similar employment agreements, Dr. Schmidt exercises as much control over his employment as any other member of OMC. By contrast, the nonshareholder-physicians have no ability to exercise any control over patient assignments or any other matter put to the directors or shareholders.

## CONCLUSION

We need not determine here whether the absence of control in and of itself will distinguish bona fide partner-employers from disguised employees when the presence of other factors may favor partnership. *Compare Sidley*, 313 F.3d at 702-03 (discussing the absence of control as a factor weighing in favor of classifying the 32 demoted partners as employees), *with id.* at 709-10 (Easterbrook, J., concurring) (relying on the presence of profit-sharing and the spectre of unlimited liability as characteristics in favor of treating the 32 as bona fide partner-employers), *and* REUSCHLEIN ET AL., *supra*, at 250 ("Many decisions permit management to be centralized in one partner, or a small committee of partners. Where this is done, co-ownership is still found to exist frequently but only if the other factors are consistent with partnership."). We only hold that when an individual claimant-shareholder enjoys the opportunity for shared control of the

closely held professional corporation, including the opportunity to share in its profits, we will treat him or her as a bona fide employer for purposes of the ADEA. The decision of district court is therefore AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*